AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>DAMIEN M. JOHNSON<br><br>*Defendant(s)* | )<br>)<br>) Case No. 2:19-mj-524<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of March 19, 2019, to April 23, 2019, in the county of Franklin in the
Southern District of Ohio, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Randal Gaddis, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 07/02/2019

*Judge's signature*

City and state: Columbus, Ohio — Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*



## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT FOR DAMIEN M. JOHNSON

I, RANDAL L. GADDIS II, being duly sworn, deposed and state the following:

### I. INTRODUCTION

1. I have been a special agent with U.S. Treasury Department since September 2012. I received training at the Federal Law Enforcement Training Center in Glynco, Georgia. The training I have received includes financial investigative techniques, constitutional law, as well as other aspects of federal law enforcement, including the legal requirements for obtaining an arrest warrant. As a Special Agent with U.S. Treasury Department, my duties include conducting financial investigations related to various violations of the United States Code. As a Special Agent I am authorized to execute arrest warrants.

2. I make this affidavit in support of a criminal complaint to obtain a warrant to arrest DAMIEN M. JOHNSON (JOHNSON) for violations of 18 USC §1344(2), (Bank Fraud)

3. The facts set forth below are based on the documents, evidence and witness statements obtained during the investigation. This affidavit is offered solely to establish probable cause in support of a warrant for the arrest of JOHNSON and does not set forth all facts known to the Government pertaining to the violation referenced above or any other matters which may be under investigation regarding JOHNSON.

### II. PROBABLE CAUSE

4. Special Agents conducting this investigation found evidence that proves that from at least March 19, 2019, to at least April 23, 2019, JOHNSON engaged in a scheme to defraud an individual, referred to in this affidavit as PERSON A, and whose full identity is known to the Government. The fraud scheme included the use of deception to effect the purloining of funds which belong to PERSON A and were under the custody or control of a financial institution.

5. According to an assessment conducted by Franklin County Office on Aging, Adult Protective Services (APS), PERSON A (who is 87 years old) suffers from symptoms of dementia including significant memory loss and confusion.

6. Based on my knowledge, obtained during the investigation of this and other matters, JOHNSON is known to work primarily as an "Energy Consultant". As an Energy Consultant JOHNSON goes door to door making sales pitches to get customers to switch the electric and natural gas provider from the public utility companies (such as AEP) to deregulated electric and natural gas providers. JOHNSON earns commission based on the number of customers that switch, and should not receive any payments directly from the customers.

7. JOHNSON obtained at least seven (7) checks totaling $73,120 from PERSON A by deception and false pretenses. JOHNSON then negotiated these checks by cashing and/or depositing them into his own account at the same financial institution, which he opened on March 20, 2019. JOHNSON made several additional cash withdrawals and other large purchases from his own account, with funds obtained from PERSON A.

8. Special Agents spoke with Rubeene Ireton (Ireton), Compliance Coordinator for of CME Federal Credit Union (CME-FCU) on June 3, 2019. Ireton provided the following information which is supported by bank records and audio recordings that I have reviewed:
   a. On 3/19/2019 JOHNSON cashed CME-FCU personal check #1852 for $1,700.00 from PERSON A, with a memo line that reads "Supplies.
   b. On 3/20/2019 JOHNSON deposited CME-FCU personal check # 1856 for $1,700.00 from PERSON A, with a memo line that reads "Supplies.
   c. On 4/5/2019 JOHNSON deposited a CME-FCU personal check #1897 for $3,360.00 from PERSON A, with a memo line that reads "work job".
   d. On 4/8/2019 JOHNSON deposit two (2) CME-FCU personal checks #1900 for $3,360.00 and #1857 for $9,000.00. Both were from PERSON A, and the memo lines read "job (ramps)" and "fence" respectively.
   e. On 4/13/2019 CME-FCU received a call from an individual who identified themselves as PERSON A. The caller inquired about the account balance and made a request to transfer $38,000.00 from savings to checking. Then stated "I'm going to be doing a withdrawal, I'm buying a car for my nephew.
   f. On 4/15/2019 JOHNSON deposited CME-FCU personal check #1824 for $30,000.00 from PERSON A, with memo line that reads "loan-debts".
   g. On 4/19/2019 CME-FCU received a call from an individual who identified themselves as PERSON A. The caller inquiring about his account balance. The caller had trouble understanding the CME-FCU representative on the phone and did not comprehend the activity that was occurring in his account. The CME-FCU representative told the caller that the balance in his checking account was $22,382.53. The caller stated that he did not expect to balance in the checking account to be that much. The CME-FCU representative told the caller that there had been a large transfer from his saving to his checking account of $38,000 on 4/13/2019 and that a check for $30,000 was written on 4/15/2019. The caller told the CME-FCU representative that he had never written a check for that large of an amount. This caused CME-FCU employees to suspect PERSON A was a victim of elder exploitation, and resulted in a call to APS.
   h. On 4/22/2019 CME-FCU received a call from an individual who identified themselves as PERSON A. The caller provided the CME-FCU representative an incorrect account number, but was able to provide the

2

correct social security number and date of birth, to get access to the account. The caller inquired about the account balance and made a request to transfer $15,000.00 from savings to checking.

    i. On 4/22/2019 JOHNSON deposited CME-FCU personal check #1830 for $24,000.00 from PERSON A, with memo line that read "help with loan/debits"

9. Special Agent's interviewed PERSON A on June 4, 2019. During the interview PERSON A provided the following information :
   a. PERSON A stated that JOHNSON was his Energy Consultant. PERSON A also stated that he used to work with JOHNSON, back when PERSON A worked for the City of Columbus repairing radios for the police and fire department.
   b. PERSON A also stated that he did not give JOHNSON any cash or checks, and that JOHNSON did not do any work at PERSON A's home.
   c. PERSON A stated the people have accused JOHNSON of taking his money, but JOHNSON did not believe them.

10. Special Agents interviewed Ron Mills (Mills), a case worker of the APS, on June 6, 2019. During the interview Mills provided the following information.
    a. Mills conducted a "well-being" visit to PERSON A's home on 4/23/2019 in response to the call they received from CME-FCU. Mills recalled being present during a previous "well-being" at the same location about a month prior. That visit was regarding PERSON A's ability to care for his wife Katie. Katie had Alzheimer's and had recently suffered a stroke, APS recommended Katie received home hospice care, because PERSON A seemed unable to care for her himself to due to his confusion and memory loss. Mills stated that the PERSON A did not remember meeting him.
    b. Mills asked PERSON A about the transactions which caused CME-FCU to believe he was being exploited. PERSON A was confused and stated that he didn't think he had that much money.
    c. PERSON A told Mills that JOHNSON was not his Nephew. PERSON A showed the Mills a notebook with JOHNSON's name and telephone number written in it. Next to JOHNSON's name was a notation that read "Energy Consultant". PERSON A confirmed to Mills that JOHNSON was his "Energy Consultant". PERSON A also stated that the two used to work together for the City of Columbus, and that JOHNSON was helping him to pay his bills. Mills observed a stack of bills in PERSON A kitchen, some of which were marked, "delinquent", "past due", or "final notice".
    d. Mills called the phone number listed for JOHNSON in PERSON A's note book. When JOHNSON answered the phone, Mills introduced himself.

      JOHNSON told Mills that the payments he received from PERSON A were loans and that he had documentation supporting them, and then hung up the phone.

    e. Mill reported his observations to CME-FCU later that day.

11. Special Agents interviewed PERSON A's son, Myron (Myron) on June 6, 2019. During the interview the Myron stated the following information:
    a. Myron stopped by PERSON A's home on his way home from work regularly to check on PERSON A and his wife (Myron's mother Katie) until she died on May 27, 2019. According to Myron, his mother was receiving hospice care following a stock in October of 2018.
    b. Myron stated that on one of his visits he met JOHNSON, who was at PERSON A's home. PERSON A told Myron that JOHNSON was his "energy consultant", and that they knew each other from when the two worked together for the City of Columbus. PERSON A told Myron that JOHNSON was helping him to pay his bills. Myron was upset because when he would offer to help PERSON A pay his bills, PERSON A would get angry and refuse his help. However Myron stated that he was so concerned about his mother's failing health he didn't realize how vulnerable is PERSON A was.
    c. Myron stated that PERSON A had been retired from the City of Columbus for at least 20 years. Per his Ohio Driver's license, Special Agents know that JOHNSON is 39 years old now and would have been 19 years when PERSON A retired from the City of Columbus. Special Agent could find no record of JOHNSON ever working for the City of Columbus. Therefore it would seem PERSON A is confusing JOHNSON with some other person he used to work with.
    d. Myron stated that PERSON A is normally a very frugal person. PERSON A is used to being independent and does not believe he needs help. PERSON A often confuses people, dates and time.
    e. Special Agents played auto recording of phone calls made to CME-FCU by callers who identified themselves as PERSON A on 4/13/2019, 4/19/2019 and 4/22/2019 (referenced above). Myron could not identify the voice in the calls from 4/13/2019 and 4/22/2019, but stated that the voice was not PERSON A. However Myron was able to confirm that the voice on the call from 4/19/2019 is PERSON A.

12. During the course of the investigation other matters involving JOHNSON, Special Agents have proven that JOHNSON has impersonated other over the phone in order to further the objective of the fraud scheme. Based on the my knowledge of the facts, and circumstances of this investigation and that of other matters under investigation involving JOHNSON, Special Agents believe that JOHNSON is the voice on the phone calls on 4/13/2019 and 4/22/2019, and that JOHNSON's

4

intent was to ensure that the funds were available so that the checks which he subsequently deposited would clear.

13. Additional information received from CME-FCU shows the following occurred after Mills visit to PERSON A's home:
    a. On 4/23/2019 JOHNSON went to the Pickerington Branch of CME-FCU and withdrew $15,500 cash from his own account, (which was funded by the checks from PERSON A). JOHNSON stated that the purpose of the cash withdrawal was to buy a car. After a review of the timeline of events and transactions that occurred on 4/23/2019, Special Agents determined that this cash withdrawal occurred after JOHNSON spoke with Mills via phone but before Mills reported his observations to CME-FCU.
    b. In light of the information Mills reported to CME-FCU regarding his well-being visit with PERSON A, CME-FCU placed access restrictions on Johnson's accounts.
    c. On 5/6/2019 JOHNSON came to CME-FCU to ask why he could not access his account. The branch manager told JOHNSON that his account was under review and that his access to the account would be restricted until further notice. JOHNSON told the branch manager that the checks from PERSON A were loans, and provided several hand written documents that he claims PERSON A signed to support the loan agreement.

14. Special Agent interviewed Oretha Garnett (Garnett), on June 24, 2019. Garnett is employed by HomeWell Senior Services, and provided hospice care for PERSON A's wife (Katie) from January 2019 until her death in May of 2019. During the interview Garnett provided the following information:
    a. Garnettt provided hospice services to Katie on Monday, Wednesday, and Friday from 1:00pm to 5:00pm.
    b. Garnett frequently heard PERSON A talking on the phone with someone from "AEP". Garnet stated that she heard PERSON A provide his checking account number over the phone on more than one occasion.
    c. Garnett identified JOHNSON from a phone line up. Garnett stated that JOHNSON claimed to be a friend of the family to PERSON A. When JOHNSON visited PERSON A he would be dressed in an AEP hat and uniform shirt with reflective yellow strips on the side.
    d. Garnett witness PERSON A give JOHNSON checks on three separate occasions. Garnett stated that checks appeared to be incomplete. Garnett also witness JOHNSON instructing PERSON A to sign a stack of documents.

15. During that period from at least March 19, 2019, to at least April 23, 2019

5

JOHNSON presented seven (7) checks from PERSON A to be negotiated at CME-FCU, totaling $73,120. JOHNSON deposited $60,470 into his account, and received cash back of $12,650. JOHNSON made subsequent cash withdrawals from his account of $39,275 (totaling $51,923 in cash transactions). The remaining amount was used to fund a variety of personal transactions. A sample of these transactions include but are not limited to a $7,150 purchase at Levi's Pawn Shop, a $1,798 Gucci purchase, $1,558 Louis Vuitton purchase, $1,182 in payments to vehicle dealers, and a $2,500 payment to a law firm. The remaining balance in JOHNSON's account is $971.26. During this time period JOHNSON only had $2520.51 of deposits into his account from sources other than PERSON A.

## III. CONCLUSIONS OF AFFIANT

16. Based on facts and circumstances stated above, I believe there exists probable cause to arrest DAMIEN M. JOHNSON (JOHNSON) for violations of 18 USC §1344(2).

Therefore, I respectfully request the issuance of an arrest warrant.

*[signature]*
Randal L. Gaddis II
Special Agent, IRS-CID

Subscribed and sworn to before me this 2nd day July of 2019

*[signature]*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE